UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION

---

CLEAN WISCONSIN and SIERRA CLUB,

          Plaintiffs,

     v.                                 Case No. 05-C-1116

WISCONSIN PUBLIC SERVICE CORPORATION,

          Defendant.

---

## CONSENT DECREE

---

**WHEREAS**, Sierra Club and Clean Wisconsin (collectively, "Plaintiffs") brought this action against Wisconsin Public Service Corporation ("WPSC") (collectively, the "Parties"), pursuant to Section 304 of the Clean Air Act (the "Act"), 42 U.S.C. § 7604, for declaratory and injunctive relief and the assessment of civil penalties for certain alleged violations of the Act, its implementing regulations and the terms of Air Operating Permit Nos. 405031990-P01 and 405031990-P10, which regulate air pollution emissions from the J.P. Pulliam power plant located in Green Bay, Wisconsin ("Pulliam Plant");

**WHEREAS**, the Parties agree that settlement of this action is in the best interest of the Parties and that entry of this Consent Decree, without further litigation, is the most appropriate means of resolving the matter;

**WHEREAS**, the Parties recognize that this Consent Decree has been negotiated in good faith and at arms' length and that this Consent Decree is fair, reasonable and consistent with the goals of the Clean Air Act;

**WHEREAS**, WPSC has denied and continues to deny the violations alleged in the Complaint, maintains that it has been and remains in compliance with the Act and is not liable for civil penalties or injunctive relief;

**WHEREAS**, the Parties desire to settle all matters by Consent Decree and avoid the costs, delay and uncertainty of further litigation; and

**WHEREAS**, the Parties have consented to entry of this Consent Decree without trial of any issues;

**NOW, THEREFORE**, without any admission of fact or law and without any admission of the violations alleged in the Complaint, it is hereby **ORDERED, ADJUDGED AND DECREED**:

## JURISDICTION, VENUE AND APPLICABILITY

1.     The Parties to this Consent Decree are Clean Wisconsin, Sierra Club and WPSC.

2.     This Court has jurisdiction over this action, the subject matter herein, and the Parties consenting hereto pursuant to 42 U.S.C. § 7604(a)(1) and 28 U.S.C. § 1331. Venue is proper under 42 U.S.C. § 7604(c)(1) and 28 U.S.C. § 1391. Solely for purposes of the complaint filed by Plaintiffs in this matter and resolved by this Consent Decree and for purposes of entry and enforcement of this Consent Decree, the Parties agree that Plaintiffs have standing to bring the claims alleged in the complaint.

3.     Upon entry by the Court, the provisions of this Consent Decree shall apply to and be binding upon the Parties and on the Parties' successors and assigns.

4.     The Parties consent to entry of this Consent Decree without further notice.

2

## **DEFINITIONS**

5.      For purposes of this Consent Decree, the following definitions shall apply:

(a)      "Clean Air Act" means the federal Clean Air Act, 42 U.S.C. §§ 7401-7671 and its implementing regulations.

(b)      "Completion Date" means the date on which the last of the ESP Improvements for the relevant Pulliam Unit becomes operational.

(c)      "Compliance Demonstration Year" means January 1, 2008 through December 31, 2008.

(d)      "Compliance Report" means the quarterly excess emission reports that are required to be submitted to the Wisconsin Department of Natural Resources pursuant to NR 439.09(10), Wis. Admin. Code, and/or any applicable permit condition.

(e)      "Consent Decree Matters" means all or a part of the matters set forth in this Consent Decree, including but not limited to the ESP Enhancements, the shutdown of any of the Pulliam Units pursuant to the Shutdown Notice provisions of this Consent Decree, the hours of operation of Pulliam Unit 3 and/or Pulliam Unit 4, the Environmental Projects and the Environmental Project Enhancements.

(f)      "Environmental Project" means a series of projects promoting energy efficiency and the use of renewable resources located within the service territory of WPSC funded by WPSC and administered by WECC as set forth in Paragraphs 15 through 17 herein.

(g)      "Environmental Project Enhancements" means additional funding for the Environmental Projects undertaken by WPSC in accordance with Paragraphs 18 through 24 herein.

(h)      "ESP Improvements" means the equipment and operational changes to be undertaken by WPSC to improve the performance of the electrostatic precipitators associated with the Pulliam Units at the Pulliam Plant as described in Attachment A to this Consent Decree.

(i)      "Force Majeure Event" is defined in Paragraph 25 herein.

(j)      "Malfunction" is defined as any sudden, infrequent, and not reasonably preventable failure of air pollution control equipment, process equipment,

3

or a process to operate in a normal or usual manner. Failures that are caused in part by poor maintenance or careless operation are not Malfunctions.

(k)   "Minimum Load Point" for purposes of Startup and Shutdown, shall be defined for each of the Pulliam Units as follows:

| | |
|---|---|
| Pulliam Unit 3 | 7 gross MWs |
| Pulliam Unit 4 | 7 gross MWs |
| Pulliam Unit 5 | 15 gross MWs |
| Pulliam Unit 6 | 15 gross MWs |
| Pulliam Unit 7 | 30 gross MWs |
| Pulliam Unit 8 | 60 gross MWs |

(l)   "Opacity Event" means any exceedance of the applicable opacity limit, except Permitted Opacity Events.

(m)   "Parties" means WPSC, Sierra Club and Clean Wisconsin.

(n)   "Permit" means the air operating permit issued by the Wisconsin Department of Natural Resources to WPSC for the Pulliam Plant, Permit Nos. 405031990-P01 and 405031990-P10.

(o)   "Permitted Opacity Events" means an opacity emission which is allowed under the Permit, by an applicable WDNR rule or by formal written approval of WDNR given in the normal course and justified under applicable law, including but not limited to those events which occur during Startup, Shutdown and Malfunction, as defined herein.

(p)   "Plaintiffs" means the Sierra Club, a non-profit corporation incorporated under the laws of California, with its principal place of business in Wisconsin located at 222 South Hamilton Street, Madison, Dane County, Wisconsin, and Clean Wisconsin, a Wisconsin non-profit corporation with its principal place of business located at 122 State Street, Madison, Dane County, Wisconsin.

(q)   "Pulliam Plant" means, collectively, the six coal-fired units (P3 through P8), the combustion turbine generator, eight diesel generators, and all other related and ancillary equipment and operations located on the same contiguous property in Green Bay, Wisconsin.

(r)   "Pulliam Unit" means one of the six coal-fired electric generating units currently operating at the Pulliam Plant which are designated as Pulliam Units 3 through 8.

(s)   "PSCW" means the Public Service Commission of Wisconsin.

4

(t)     "Regulatory Proceeding" means an administrative proceeding or administrative approval or permitting process before the Public Service Commission of Wisconsin or the Wisconsin Department of Natural Resources.

(u)    "Shutdown" is defined as that period of time, during the process of ceasing combustion of a Pulliam Unit, from when the unit load drops to less than the Minimum Load Point, as defined herein, to the time the fans are off after purging the boiler of any possible combustible gases.

(v)    "Shutdown Notice" means a written notice from WPSC to Plaintiffs stating that one or more of the Pulliam Units will permanently cease operations.

(w)    "Shutdown Units" means those Pulliam Units identified in and subject to the Shutdown Notice.

(x)    "Startup" is defined as that period of time, during the process of beginning combustion, when the fans are started for purging the boiler of any possible combustible gases to the time the unit load is greater than the Minimum Load Point, as defined herein.

(y)    "WDNR" means the Wisconsin Department of Natural Resources.

(z)    "WECC" means Wisconsin Energy Conservation Corporation.

(aa)    "WPSC" means Wisconsin Public Service Corporation, a Wisconsin corporation with its principal place of business at 700 North Adams Street, Green Bay, Wisconsin.

## ATTORNEY FEES

6.    WPSC shall pay attorney fees and costs in the amount of thirty-five thousand dollars ($35,000) to the attorneys for Plaintiffs, Garvey McNeil & McGillivray, S.C. This payment shall be made payable to Garvey McNeil & McGillivray Client Trust Account within thirty (30) days after the Court approves this Consent Decree. This payment of all attorney fees and costs shall satisfy all obligations of WPSC to pay attorney fees and costs arising out of or related to this case, other than future costs and reasonable attorney fees incurred by the Plaintiffs to monitor and enforce the terms of this Consent Decree. For purposes of monitoring only, WPSC shall pay Plaintiffs'

5

reasonable costs and attorney fees, not to exceed ten (10) hours of attorney time, incurred in monitoring the implementation of the terms of this Consent Decree, including but not limited to, reviewing reports by WPSC regarding its compliance with the deadlines in Paragraph 7 (as modified by Paragraphs 9 and 10 for Shutdown Units), the annual hours of operation of Pulliam Units 3 and 4 pursuant to Paragraph 13, reviewing WPSC's application for a Title V permit renewal pursuant to Paragraph 14, reviewing reports submitted pursuant to Paragraphs 19 through 22, and WPSC's determination of Environmental Project Enhancements pursuant to Paragraph 21. Nothing in this Paragraph 6 shall apply to any future fees and costs incurred by Plaintiffs to enforce the terms of this Consent Decree. Such future fees and costs may be recovered to the extent allowed by applicable law.

## PULLIAM ACTIONS

7.      Subject to the Shutdown Notice provisions set forth in Paragraphs 8 through 12 below, WPSC shall complete the ESP Improvements by the following dates:

| Unit | Construction Completion Date |
|------|------------------------------|
| Pulliam Unit 3 | December 31, 2007 |
| Pulliam Unit 4 | December 31, 2007 |
| Pulliam Unit 5 | December 31, 2006 |
| Pulliam Unit 6 | December 31, 2007 |
| Pulliam Unit 7 | December 31, 2006 |
| Pulliam Unit 8 | December 31, 2007 |

8.      Upon written agreement of the Parties, WPSC may modify the ESP Improvements. WPSC shall provide the Plaintiffs with reasonable notice of the Completion Date.

9.      In lieu of undertaking ESP Improvements at a Pulliam Unit, WPSC may provide a Shutdown Notice to the Plaintiffs no later than thirty (30) days from the lodging of this Consent

6

Decree. The Shutdown Notice shall identify each unit subject to and covered by the Shutdown Notice and, separately for each unit defined, the date by which the Shutdown Unit(s) will cease operations. Subject to Paragraph 10, (a) the last day of operation of any Pulliam Unit(s) identified in a Shutdown Notice shall be no later than December 31, 2007 and (b) WPSC is not required to undertake any ESP Improvements on any Shutdown Units, provided that the unit is permanently shut down by the date specified in the Shutdown Notice or before December 31, 2007, whichever occurs first.

10.     Should the PSCW determine that WPSC's decision to shut down the Shutdown Unit(s) is unreasonable or imprudent, or otherwise disallows WPSC's recovery of incremental costs associated with the proposed shutdown(s) ("PSCW Order"), WPSC shall, within sixty (60) days of the date of the PSCW Order, submit to Plaintiffs a schedule for implementing the ESP Improvements on the Shutdown Units. The schedule shall require installation of the ESP Improvements within twelve (12) months of the date of the PSCW Order or such other time as mutually agreed, and this schedule shall replace the schedule set forth in Paragraph 7. If the PSCW Order includes Pulliam Unit 3 and/or Pulliam Unit 4, WPSC shall limit the operation of such Unit(s) to 1,000 hours per calendar year. This limitation on hours of operation shall become effective beginning January 1 of the year following the PSCW Order, and WPSC will apply to the WDNR for a permit revision limiting operation to 1,000 hours per calendar year for the unit(s). WPSC shall pursue PSCW approval of the proposed shut down of any Shut Down Units as soon as possible, but no later than the next available PSCW ratemaking proceeding for WPSC.

11.     Any Shutdown Units shall be operated in accordance with the applicable Pulliam Plant's Startup and Shutdown Plan and Malfunction Prevention and Abatement Plan in order to

7

minimize, to the extent practicable, any Opacity Event that may occur during the time the Shutdown Unit is operating.

12.     Should WPSC include either or both Pulliam Unit 3 and Pulliam Unit 4 as Shutdown Units, WPSC shall be limited in the amount of air emission decrease it may claim under NR 405.02(24), Wis. Admin. Code, with respect to Pulliam Unit 3 and/or Pulliam Unit 4. In calculating any creditable emission decrease for Pulliam Unit 3 and/or Pulliam Unit 4, the maximum creditable emission decrease under NR 405, Wis. Admin. Code, shall be based on the amount of emission decreases that would be otherwise creditable and would occur had Pulliam Unit 3 and/or Pulliam Unit 4 only operated 1,000 hours during the "contemporaneous" period, as defined in NR 405.02(24)(b) (2004), Wis. Admin. Code, based on the maximum dependable capacity during the three years preceding entry of this Agreement. This shall not affect any other eligibility for credits or requirements of the Clean Air Act applicable to Pulliam Unit 3 and/or Pulliam Unit 4.

13.     Beginning January 1, 2007, Pulliam Unit 3 and Pulliam Unit 4 shall operate no more than 1,000 hours each per calendar year, provided, however, if Pulliam Unit 3 or Pulliam Unit 4 or both are designated as a Shutdown Unit pursuant to Paragraph 9 above, this Paragraph 13 shall not apply to such designated unit(s), and the designated unit(s) shall not be limited by the Consent Decree in terms of the number of hours the unit(s) may be operated during 2007, provided that WPSC complies with the requirements for a Shutdown Unit in Paragraphs 9 through 12 herein.

14.     Subject to Paragraph 10, by no later than sixty (60) days after entry of this Consent Decree by the Court, WPSC shall submit an application to the WDNR for a revised Permit that limits the operation of Pulliam Unit 3 and Pulliam Unit 4 to 1,000 hours each per calendar year.

8

WPSC shall not seek to amend the Permit or any future permit or otherwise seek WDNR or United States Environmental Protection Agency approval to increase the hours of operation for Pulliam Unit 3 or Pulliam Unit 4 above 1,000 hours per year. If either (or both) Pulliam Unit 3 and/or Pulliam Unit 4 is designated as a Shutdown Unit pursuant to Paragraph 10 above, WPSC shall instead notify WDNR within sixty (60) days of the Shutdown Notice that Pulliam Unit 3 and/or Pulliam Unit 4 will permanently cease operations after December 31, 2007.

### ENVIRONMENTAL PROJECTS

15.     WPSC shall spend no less than Five Hundred Thousand Dollars ($500,000), plus any Environmental Project Enhancement, implementing the Environmental Project set forth in Paragraphs 16 and 17. The expenditures under this Paragraph 15 shall be in addition to the spending requirement set forth in Wis. Stat. § 196.374(3)(b)(2), any other spending on energy efficiency or renewable energy projects mandated by the PSCW, and any other conservation funds WPSC has voluntarily committed to spend outside the terms and prior to the entry of this Consent Decree; provided, however, that WPSC may fund an expansion of an existing program to include ratepayers or projects not otherwise eligible under the existing statutory or PSCW-mandated program.

16.     By December 31, 2006, WPSC shall enter into an agreement with WECC to undertake an Environmental Project focused on energy efficiency. The agreement with WECC shall, at a minimum, include the following elements:

(a)     WPSC and WECC shall work in a collaborative manner in developing the Environmental Project and each shall make a good faith effort to reach mutual agreement on the design of the Environmental Project by December 31, 2006; however, WECC shall retain the final authority to decide on the

9

design of the Environmental Project should WPSC and WECC not reach a mutual agreement.

(b)     WECC shall work in a collaborative manner with Plaintiffs in designing the Environmental Project.

(c)     If the final design of the Environmental Project is determined and agreed to by December 31, 2006 (or an impasse is reached and WECC sets the design of the project by December 31, 2006), WPSC shall pay $500,000 to WECC to fund the Environmental Project. If the final design is not determined until 2007, WPSC shall pay $500,000 to WECC by the end of January 2008.

(d)     If the design of the Environmental Project is not established in time to allow the Environmental Project to be undertaken in 2006, then the Environmental Project shall be undertaken in 2008 and any Environmental Project Enhancements shall be added to the amount to be expended by WPSC.

(e)     The Environmental Project shall be a new program that is not otherwise required by law or a PSCW order to be undertaken by WPSC; provided, however, that WPSC may fund an expansion of an existing program to include ratepayers or projects not otherwise eligible under the existing statutory or PSCW-mandated program.

(f)     Within thirty (30) days of completion of the Environmental Project, WECC shall certify to Plaintiffs and WPSC that the Environmental Project was undertaken and completed. Upon completion of the Environmental Project WECC will provide Plaintiffs and WPSC with a report summarizing the results of the Environmental Project, including but not limited to the units of energy saved and cost-effectiveness per unit of energy as a result of the Environmental Project.

17.     WPSC shall provide the Plaintiffs with a copy of the WECC/WPSC agreement and proof of funding of the Environmental Project within thirty (30) days after the WECC/WPSC agreement is signed and thirty (30) days after the funding occurs.

## ENVIRONMENTAL PROJECT ENHANCEMENTS

18.     During the Compliance Demonstration Year, the following Environmental Project Enhancements shall accrue for Opacity Events, except that Environmental Project Enhancements shall not accrue for Opacity Events associated with Shutdown Units:

10

| Opacity Exceedance | Environmental Project Enhancement |
|---|---|
| First 240 six-minute opacity exceedances | $500 per six-minute exceedance |
| Next 240 six-minute opacity exceedances | $3,000 per six-minute exceedance |
| Next 240 six-minute opacity exceedances | $3,500 per six-minute exceedance |
| Over 720 six-minute opacity exceedances | $5,500 per six-minute exceedance |

Between January 1, 2007 and December 31, 2007, WPSC shall use best efforts to avoid any Opacity Events associated with Pulliam Unit 7 and/or Pulliam Unit 5; recognizing that Pulliam Unit 5 and Pulliam Unit 6 share a common stack so that the emissions from the common stack may or may not indicate the opacity performance of Pulliam Unit 5 during the period between January 1, 2007 and December 31, 2007 when Pulliam Unit 6 is operational or otherwise emitting to the common stack.

19.     In calculating the number of Opacity Events and the corresponding Environmental Project Enhancements, all six-minute exceedances of the applicable opacity limitation set forth in the permit (but not including Permitted Opacity Events) associated with each individual Pulliam Unit (except any Shutdown Units), that occur during the Compliance Demonstration Year shall be summed.

20.     During the Compliance Demonstration Year, WPSC shall provide to the Plaintiffs and, upon request, shall provide to the United States Environmental Protection Agency, Region 5, copies of its Compliance Reports at the same time and in the same format that such reports are provided to the WDNR.  The first Compliance Report shall include the data for the first quarter of 2008 and subsequent reports shall include the date for each successive quarter of that year.  For the period between January 1, 2007 and December 31, 2007, WPSC shall provide to Plaintiffs and, upon request, shall provide to the United States Environmental Protection Agency, Region 5, copies of its Compliance Reports relating to Pulliam Unit 7 and Pulliam Unit 5, at the same time and in the same format that such reports are provided to the WDNR.

21.     Within forty-five (45) days of the submission of the last Compliance Report, WPSC will notify Plaintiffs of the total amount of Environmental Project Enhancements to be spent pursuant to Paragraphs 18 through 20. The notice shall include information supporting the calculation of the Environmental Project Enhancements, including but not limited to the specific identity and total number of the Opacity Events for the Pulliam Unit(s), the total number of Opacity Events for all Pulliam Units, the number of opacity exceedances attributed to Startup, the number of opacity exceedances attributed to Shutdown and the number of opacity exceedances attributed to Malfunction, together with documentation necessary to support WPSC's conclusion that such event(s) were caused by Startup, Shutdown or Malfunction. Within forty five (45) days of Plaintiffs' receipt of the notice from WPSC, Plaintiffs will provide WPSC with any objections or disputes regarding the number of Opacity Events and calculation of Environmental Project Enhancements.

22.     The Environmental Project Enhancements shall be added to the amount spent under Paragraph 15, unless there is a dispute over the amount, which dispute shall be resolved pursuant to Paragraph 23 below. WPSC shall pay the amount due for Environmental Project Enhancements within sixty (60) days of the response by Plaintiffs to WPSC's notification under Paragraph 21, unless there is a dispute regarding the correct amount of Environmental Project Enhancements, in which case WPSC will pay the amount due within thirty (30) days of resolution of the amount due pursuant to Paragraph 23. Payment shall be made to WECC and accounted for and expended in the same manner as described in Paragraph 16 hereto.

23.     In the event of any disputes over the amount of the Environmental Project Enhancements, WPSC and the Plaintiffs shall negotiate in good faith for up to thirty (30) days. If disputes remain after the 30-day negotiating period, the dispute shall be resolved by the Court. The

12

Court shall interpret this Consent Decree to determine what, if any, Environmental Project Enhancements shall be paid pursuant to the schedule set forth in Paragraph 18.

24.     WPSC shall not be liable under this Consent Decree for any Opacity Event that occurs after the Compliance Demonstration Year.  Plaintiffs reserve all rights to enforce the Clean Air Act through a new action for violations, other than those resolved under this Consent Decree.


## FORCE MAJEURE

25.     For purposes of this Consent Decree, a "Force Majeure Event" shall mean an event that has been or will be caused by circumstances beyond the control of WPSC, its contractors or any entity controlled by WPSC that delays compliance with any provision of this Consent Decree or otherwise causes a violation of any provision of this Consent Decree despite WPSC's best efforts to fulfill the obligation.  Best efforts to fulfill the obligation include using best efforts to anticipate any potential Force Majeure Event and to address the effects of such event (i) as it is occurring and (ii) after it has occurred, such that the delay or violation is minimized to the greatest extent possible. Unanticipated or increased costs or expenses associated with the performance of WPSC's obligations under this Consent Decree shall not constitute a Force Majeure Event.

26.     Notice of Force Majeure Events.  If any event occurs or has occurred that may delay compliance with or otherwise cause a violation of any obligation under this Consent Decree, as to which WPSC intends to assert a claim of Force Majeure, WPSC shall notify the Plaintiffs in writing and in accordance with Paragraph 42 as soon as practicable, but in no event later than fourteen (14) business days following the date WPSC first knew or by the exercise of due diligence should have known that the event caused or may cause such delay or violation.  In this notice, WPSC shall

13

reference this Paragraph 26 of this Consent Decree and describe the anticipated length of time that the delay or violation may persist, the cause or causes of the delay or violation, all measures taken or to be taken by WPSC to prevent or minimize the delay or violation, the schedule which WPSC proposes to implement those measures and WPSC's rationale for attributing a delay or violation to a Force Majeure Event. WPSC shall adopt all reasonable measures to avoid or minimize such delays or violations. WPSC shall be deemed to know of any circumstances which WPSC or any entity controlled by WPSC knew or should have known.

27. <u>Failure to Give Notice</u>. If WPSC fails to comply with the notice requirements of Paragraph 26, Plaintiffs may void WPSC's claim for Force Majeure as to the events for which WPSC failed to comply with the notice requirements.

28. <u>Plaintiffs' Response</u>. If Plaintiffs do not accept WPSC's claim of Force Majeure, if the Plaintiffs do not agree with WPSC that a violation of this Consent Decree was caused by a Force Majeure Event or if the Plaintiffs do not agree with WPSC on the length of delay actually caused by a Force Majeure Event, the matter shall be resolved by the Court. In any dispute regarding Force Majeure, WPSC shall bear the burden of proving that any delay in performance or any other violation of any requirement of this Consent Decree was caused by or will be caused by a Force Majeure Event. WPSC shall also bear the burden of proving that WPSC gave the notice required by Paragraph 26 and of proving the anticipated duration and extent of any delay(s) attributable to a Force Majeure Event.

29. Subject to the provisions of Paragraphs 25 through 28, if a delay or violation is caused by a Force Majeure Event, such delay or violation shall not be considered a violation of this Consent Decree.

## COVENANT NOT TO SUE

30.     Plaintiffs covenant not to sue WPSC, affiliates, parent, subsidiaries or its officers, directors, shareholders, representatives and assigns, for any Opacity Event set forth in the Permit that may occur at any Pulliam Unit from the date of approval of this Consent Decree until the end of the Compliance Demonstration Year, provided, however, that this covenant not to sue shall not apply to any action to enforce this Consent Decree.

## EFFECT OF SETTLEMENT

31.     This Consent Decree represents full and final settlement between the Parties and resolves any and all liability WPSC may have to the Plaintiffs for all violations alleged in the complaint filed by the Plaintiffs in this proceeding and any similar violations which may have occurred at the Pulliam Plant through the date of approval of this Consent Decree.

32.     The Plaintiffs reserve all legal and equitable remedies available to enforce the provisions of this Consent Decree, except as expressly stated herein.

33.     WPSC reserves all rights to defend against any such effort to enforce this Consent Decree, except as expressly stated herein.

## TERMINATION

34.     This Consent Decree shall automatically terminate ninety (90) days after the expiration of the Compliance Demonstration Year unless Plaintiffs provide, pursuant to Paragraph 21, objections or disputes to WPSC that indicate that Plaintiffs disagree with WPSC's calculation of Environmental Project Enhancements, in which case this Consent Decree shall terminate upon

15

the resolution of such dispute and, if required, the payment of any Environmental Project Enhancements. The Court is presumed to maintain jurisdiction to determine any dispute under this Consent Decree.

## REGULATORY PROCEEDINGS

35.     With respect to any Consent Decree Matter that is involved in or a part of any Regulatory Proceeding, Plaintiffs will not participate in a Regulatory Proceeding through which WPSC is seeking an order or decision in such a manner that Plaintiffs' position(s) conflict with WPSC's position as to any Consent Decree Matter. Plaintiffs reserve the right to comment on, oppose or appeal any future permit or order in any Regulatory Proceeding regarding the Pulliam Generating Station or other WPSC facility, except to the extent that this Consent Decree expressly governs. If WPSC believes that any Plaintiff or Plaintiffs are participating in a Regulatory Proceeding in a manner that violates this Paragraph 35: (i) WPSC will provide such Plaintiff or Plaintiffs with written notice of any alleged breach pursuant to Paragraph 42; (ii) such Plaintiff or Plaintiffs shall cure such breach by promptly filing written notice with the regulatory agency before which such Regulatory Proceeding is being held, withdrawing from the Regulatory Proceeding and dismissing any petitions, issues or claims raised by Plaintiff or Plaintiffs in the Regulatory Proceeding; and (iii) WPSC's sole remedy for a breach shall be specific performance.

36.     Unless otherwise agreed to by the Parties, in writing, WPSC shall not claim, take the position or otherwise assert in any Regulatory Proceeding involving a Consent Decree Matter (and in any appeals of a decision involving a Consent Decree Matter) that the Plaintiffs support the position being advanced by WPSC with respect to any Consent Decree Matter. WPSC agrees that

16

it will not seek an order, permit or administrative remedy that negates, modifies or otherwise interferes with WPSC's obligations under this Consent Decree.

## **GENERAL PROVISIONS**

37.     WPSC shall undertake the obligations required by this Consent Decree in accordance with applicable federal, state and local laws and regulations, and in accordance with any validly issued air operating permit issued to WPSC for the Pulliam Plant, including Permit No. 405031990-P10.  This Consent Decree is not a permit and does not relieve WPSC of its responsibility to comply with all applicable federal, state and local laws and regulations and order of this Court.

38.     The Court shall retain jurisdiction to enforce the terms of this Consent Decree.

39.     The Parties agree that approval of this Consent Decree may be achieved by the actual signature of the Parties' authorized representatives, a copy or facsimile of said actual signature being valid as the original.

40.     The recitals set forth above are an integral part of this Consent Decree and are incorporated herein by reference.

41.     Except as otherwise provided herein, this Consent Decree cannot be amended, modified, clarified or explained, except by a writing executed by the Parties, which expresses, by its terms, an intention to modify this Consent Decree and that is approved by the Court in accordance with the procedures of 42 U.S.C. § 7604(c)(3).

42.     Notice.  When notice is required to be given under the terms of this Consent Decree, notice will be given by facsimile and United States mail to the following representatives of the Parties:

17

For Clean Wisconsin:        David Bender
                            Garvey McNeil & McGillivray, S.C.
                            634 West Main Street #101
                            Madison, WI  53703
                            608-256-0933 (facsimile)

                            Katie Nekola
                            Clean Wisconsin
                            122 State Street #200
                            Madison, WI  53703
                            608-251-1655 (facsimile)

For Sierra Club:            David Bender
                            Garvey McNeil & McGillivray, S.C.
                            634 West Main Street #101
                            Madison, WI  53703
                            608-256-0933 (facsimile)

                            Bruce Nilles
                            Sierra Club
                            122 West Washington Avenue #830
                            Madison, WI  53703
                            608-257-3513 (facsimile)

                            Aaron Isherwood
                            Senior Staff Attorney
                            Sierra Club Environmental Law Program
                            85 Second Street, 2d Floor
                            San Francisco, CA 94105-3441
                            415-977-5793 (facsimile)

For WPSC:                   Mark A. Thimke
                            Foley & Lardner LLP
                            777 East Wisconsin Avenue
                            Milwaukee, WI  53202-5306
                            414-297-4900 (facsimile)

                            Connie Lawniczak
                            Elyse Stackhouse
                            Wisconsin Public Service Corporation
                            700 N. Adams Street
                            P.O. Box 19002
                            Green Bay, WI  54307-9002
                            920-433-1176 (facsimile)

18

## **FINAL JUDGMENT**

43.     Judgment on these terms are hereby entered without further notice or proceedings.


**SO ORDERED** this ___10th___ day of January, 2007.

<div style="margin-left: 40%">

BY THE COURT:


s/ William C. Griesbach_____
Honorable William C. Griesbach
United States District Judge

</div>

Case 1:05-cv-01116-WCG   Filed 01/10/07   Page 19 of 20   Document 28

## ATTACHMENT A - <u>ESP IMPROVEMENTS</u>

1.    ESP Water Washing (Pulliam Units 3 through 8) – This upgrade consists of engineering and fabrication of piping to facilitate periodic off line water washing of the ESPs.  Water washing removes the residual layer of fly ash and allows the ESP to perform closer to optimum performance.

2.    Flow Modeling and Modifications (Pulliam Units 3, 4, and 6) – Upgrade includes a formal engineering study of gas flow through the ESPs. Based on that study, addition of flow straightening and balancing devices (turning vanes, baffles, etc.) may be added to improve fly ash distribution and gas flow balance through the ESP sections.

3.    $SO_3$ Injection System (Pulliam Units 3 and 4) – The upgrade of the $SO_3$ system skid includes separating the existing common unit 3 & 4 system skid into two independent systems with upgraded components.  The $SO_3$ system reduces the resistivity of the fly ash and improves collection efficiency within the ESP.

4.    General ESP Upgrades – The general ESP upgrades include updating ESP rapper controls, adding new wires, and adding automatic voltage controllers to various units.  All of these upgrades will improve ESP fly ash collection efficiency.

   (a)   Updated Automatic voltage Controllers (Pulliam Units 3, 4, 5, 6, 7, and 8) will improve the voltage levels to the ESP input providing improved fly ash collection efficiency.

   (b)   New Discharge Electrodes and Split Electrical Fields (Pulliam Units 7 and 6 respectively) will improve the overall ESP fly ash collection efficiency.

## <u>OTHER IMPROVEMENTS</u>

5.    Coal Crusher Replacement – The objective of this project is to provide coal of consistent size at the desired rate and quality to the Plant in order to reduce or eliminate operating problems, including opacity issues, associated with coal size variation.  This project will be evaluated through a full permitting review that will include confirmation of PSD non-applicability, and is subject to compliance with all applicable permitting requirements.

1